Filed 3/28/22  P. v. Wilson CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ALPHONSO RAY WILSON JR.,<br><br>        Defendant and Appellant. | A161420<br><br>(Solano County<br> Super. Ct. No. VCR187924) |

Alphonso Ray Wilson, Jr., appeals the denial of his petition for resentencing under Penal Code section 1170.95.  The trial court denied his petition at the prima facie stage on two grounds: (1) Wilson was ineligible for resentencing as a matter of law because his 2010 murder convictions included felony-murder special circumstance findings and (2) on the merits, Wilson failed to make the prima facie showing that would entitle him to an evidentiary hearing.

On appeal, Wilson contends he established a prima facie case for relief as a matter of law and the trial court erred by engaging in factfinding at the prima facie stage.  We conclude, however, that it was appropriate for the trial court, at the prima facie stage, to review the record of conviction to determine whether Wilson's felony-murder special circumstance findings were supported by substantial evidence.  We further conclude sufficient evidence

1

supports the felony-murder special circumstance findings in this case.  We therefore affirm.

## BACKGROUND

A.    *Wilson's Murder Convictions*

    1.    <u>Facts of the Robbery and Murders</u>

The following facts of the crimes are taken from *People v. Wilson* (Jan. 22, 2013, A129064) [nonpub. opn.] (*Wilson I*).

"On January 17, 2007, the police found the bodies of two men, James Werder and Manuel Caldera.  Several months later, . . . [Wilson] was interviewed by [law enforcement].  [Wilson] first denied any involvement in the killings, but ultimately confessed that he and another man, Charles Camper, had robbed Caldera and Werder.  He told the police that, during the robbery, Camper killed Caldera and Werder.

"Wilson told the police officers that Werder and Caldera operated an ice cream truck business.  They also grew and sold marijuana.  Wilson and Camper[] lived with Werder and Caldera.  Wilson was 18, and had been in special education for 'a little bit of ADD' since the third grade.  Wilson had been friends with Camper for several years, but dropped the friendship because Camper was involved with gangs.  However, when he needed a place to stay, Wilson stayed with Camper for about three months, and they became friends again.  [(Fn. omitted.)]

"After Wilson met Werder and Caldera, the two men told him that they 'got a little job for you [Wilson] I want you to do.'  Werder and Caldera asked him to work in their ice cream truck business and Wilson agreed.  Wilson didn't know until he got to their house that they 'had a weed lab there.' . . . He didn't smoke marijuana and he didn't want to be around it. . . .

"Wilson moved in with the victims in October and Camper joined him in November, after he turned 18; Wilson was with Manuel Caldera 'all the time.' Camper, on the other hand, had a warrant out for his arrest, so he stayed in the house and 'watch[ed] the weed lab. . . .' [¶] . . .

"Wilson got paid for driving the ice cream truck, but Camper did not. 'He [Camper] really wasn't catching on how to grow the weed when they got mad at him. Talking about they wanted to kick him out. He [Camper] didn't want to go.' The money Wilson earned selling ice cream was often left on the table in the house for him to spend for his expenses. It was his practice to call Caldera first and asked him for permission to do so.

"Camper had 'go[t] in and out of arguments' with Caldera and Werder. Wilson told the detectives that neither Caldera nor Werder had threatened to kill Camper. Nor had they threatened to kill Wilson. Wilson also told the police detectives that 'If they [Werder and Caldera] would have threatened [Camper] then I would have gone, I'm cool. . . . [¶] . . . I would have said I can't work this ice cream business[ and] . . . [¶] . . . I would've left.' The victims did threaten Camper when he first 'came in.' They thought Camper was sneaky and told him that 'if he ever pull something we're gonna shoot you.'

"Wilson had seen Caldera shoot people on two occasions. Camper told defendant that he wished he'd been there. According to Wilson, Camper told him 'my finger trigger happy. I'm ready to kill anybody. . . . [¶] . . . he like so I'm gonna die anyway. . . . [¶] . . . He don't care if he got it. He never trying to change his lifestyle.' [¶] . . .

"It was Wilson's plan to rob Caldera and Werder, and he told Camper ' "we might have to take 'em out." ' Camper 'was like, "All right." So then I was thinking like I don't know though, should you do it or not? Cause you

3

know?  I don't know.  I—I was kind of telling him, it ain't right.  And I was thinking man, that's it for you if you pull the trigger.  And I [didn't[1]] think he was gonna do it.  I thought he was just bullshitting me, man.'

"Wilson told the police officer that he felt like 'getting out of this gang 'cuz what if the police come and kick the door down?  We got a—they got all this stuff and it don't feel right.  I was like, "I'm ready to take the money."  But I was kind of thinking like, I'm gonna wait until they gone and I take they money.  And then I'll just never come back to the Vallejo um, the older guy won't kill me.'  He was afraid of the victims.

"Wilson and Camper's plan was that Camper would hold Caldera and Werder at gunpoint, and Wilson would take the money.  Camper took a gun out of Caldera's truck before they entered the house.  He told Wilson: ' "Are you sure you want to take the money?" . . . Then he [Camper] was like, "I'm gonna have to kill 'em."  Then I'm thinking like—thinking like no let's just take the money, he's like "I'm gonna have to do it."  And that's when he hit me with that my finger trigger is itchy.'

---

[1] *Wilson I* recounts that Wilson said to the police, "And I think he was gonna do it."  This is also what the transcript of the Wilson's videotaped police interview provides.  Wilson argues in this proceeding that the transcript is incorrect, and he said, "I *didn't* think he was gonna do it."  A DVD of the police interview was submitted to the trial court in support of Wilson's petition and is part of the appellate record.  We have reviewed the video and agree with Wilson that it sounds as though he very softly said, "didn't," before, "think he was gonna do it," and then went on to say, "I thought he was just bullshitting me, man," as the transcript indicates.  Wilson does not claim there are any other misstatements in *Wilson I* and relies on the summary of facts in *Wilson I* in his own "Statement of Facts."  We acknowledge Wilson's point, but, as we discuss, it makes no difference to the result because a factfinder would have been free to disregard this self-serving statement in the face of the rest of the evidence.

"At some point before this, Caldera and Werder took Camper with them to deliver some marijuana to a customer. They told Camper, 'we know you got a warrant, but come on . . . you can go out this time.' Camper was happy to go. When they came back, Wilson began 'thinking like man, I feel like a hostage up in here. I 'm like man, I can take the money and just be cool. I don't even have to kill nobody . . . .'

"On January 15, 2007, Wilson and Camper entered the house. Wilson went to the table where the money was located. 'I'm like—am gonna take the money. And then I was like damn, I kept thinking in my head. I don't think we should kill 'em.' Wilson told the police that 'basically I didn't want to plan out a murder. I wanted to just take the money and—and get out.' He wanted Camper to point the gun at the victims, frighten them, so he could 'grab the money and we leave.' However, after they entered the house, Camper shot and killed Werder and Caldera. Wilson watched Camper shoot both men '[a]nd I was like fuck. I was like you weren't supposed to kill him.'

"Both men fled to Washington State. When he eventually returned to California, Wilson was arrested."

A.P., Wilson's girlfriend at the time, testified that in mid-January 2007 Wilson picked her up from school in a silver BMW. "They drove around for a while, then switched to a Chevy Tahoe and then back to the silver BMW. [(Caldera owned a Chevy Tahoe and a silver BMW.)] [A.P.] was aware that [Wilson] was living in a house with two men and he was helping them harvest marijuana. She believed that [Wilson] and Camper 'were in some kind of gang . . . .' [Wilson] told her that the situation in the house had become extremely dangerous for him and for Camper. He told her that the victims 'had threatened both Charles [Camper] and [Wilson] to kill them if they tried to leave . . . .' [(Fn. omitted.)]

5

"[Wilson] told her that he and Camper had been involved in the murder. He told her that he had taken a lot of money from the victims. She wasn't sure if the murders were gang-related or simply financially-related. She remembered telling a police detective after the murders of Caldera and Werder that defendant told her that Camper "had to kill" the victims because they were in a gang. [Wilson] told her that Camper had killed the victims because he (Camper) "was in a situation where he felt it was kill or be killed . . . .' "

In an interview with a newspaper reporter, "Wilson admitted that he had bragged to his friends about being the killer, but when [the reporter] asked him about it, he said that he had not killed Caldera or Werder. [Wilson] remembered telling friends that he had killed Caldera and Werder 'for all this money.' He told [the reporter] that the original plan with Camper was simply to steal the cash and the truck, not to kill the men. The men were his friends, in fact. Camper, however, was afraid that Caldera and Werder would seek revenge for the robbery, which is why he shot them. Wilson did not feel the killings of Caldera and Werder were his fault."

Camper was found shot to death in the Sacramento–San Joaquin Delta prior to Wilson's trial.

2. Charges and Jury Verdict

In 2008, the Solano County District Attorney filed a two-count information against Wilson, charging him with the murders of Werder (Pen. Code,[2] § 187, subd. (a); count 1) and Caldera (*ibid.*; count 2). For each count, it was alleged Wilson discharged a firearm causing great bodily injury and death (§ 12022.53, subd. (d)) and the murder was committed while Wilson

---

[2] Further undesignated statutory references are to the Penal Code.

6

was engaged in the commission of a robbery within the meaning of section 190.2, subdivision (a)(17) (§ 190.2(a)(17))—the felony-murder special circumstance.

In 2010, a jury found Wilson guilty of first degree murder of both victims. The jury found the firearm allegation not true as to count 2 (murder of Caldera) and could not reach a verdict on whether Wilson discharged a firearm in the commission of count 1 (murder of Werder). Thus, the jury did not find Wilson was the actual shooter of either of the victims.[3]

The jury found the felony-murder special circumstance true for both murders. The trial court sentenced Wilson to life in prison without the possibility of parole.

In 2013, this court affirmed the judgment in *Wilson I*.[4]

B.    *Applicable Law and Changes to the Law*

Here, we pause to briefly review the difference between felony murder and the felony-murder special circumstance at the time the jury convicted Wilson, the courts' evolving understanding of the types of conduct required for the felony-murder special circumstance, the recent change in the definition of felony murder, and the statutory procedure to enable defendants who were convicted of felony murder under the old law to seek relief based on the recent change in the law.

---

[3] On the other hand, the jury did not definitively reject the allegation that Wilson shot Werder. The forensic evidence showed each victim was shot multiple times and the bullets recovered from their bodies suggested different weapons were used. A criminalist testified that two weapons were involved, most likely a 9 mm semiautomatic and a .38 or .357 revolver.

[4] We reversed the jury's special circumstance finding of more than one murder (§ 190.2, subd. (a)(3)) based on instructional error, and we affirmed the remaining judgment.

At all relevant times—that is, from the time of the murders in 2007 to the present—section 189 has defined first degree murder to include felony murder, which is murder "committed in the perpetration of" certain felonies, including robbery. (§ 189, subd. (a).) At the time the jury convicted Wilson of two first degree murders, section 189 did not distinguish between accomplices and actual killers. (Former § 189, as amended by Stats. 2002, ch. 606, § 1; see *People v. Clark* (2016) 63 Cal.4th 522, 615 (*Clark*) [recognizing the actus reus requirement for an accomplice to first degree felony murder—as the law then existed—was aiding and abetting a felony that results in murder and the mens rea requirement for an accomplice was the same as that for the actual killer].)

In contrast to first degree felony murder as it existed when Wilson was convicted, the felony-murder *special circumstance* of section 190.2(a)(17) has at all relevant times required additional elements for accomplices who did not actually kill. The felony-murder special circumstance applies to a defendant who was not the actual killer only if the defendant acted "with *reckless indifference* to human life and as a *major participant*" to "aid[], abet[], . . . or assist[] the commission of a[n enumerated] felony . . . which results in the death of some person or persons." (§ 190.2, subd. (d), italics added.)

In 2015 and 2016, the California Supreme Court clarified the meaning of the phrases "major participant" and "reckless indifference to human life" as used in section 190.2 in two decisions, *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *Clark, supra,* 63 Cal.4th 522. (*People v. Price* (2021) 71 Cal.App.5th 1128, 1134 (*Price*), rev. granted Feb. 9, 2022, S272572.) *Banks* and *Clark* "narrowed the circumstances under which a person may qualify for

the felony-murder special circumstance."[5] (*In re Moore* (2021) 68 Cal.App.5th 434, 4391.)

Since *Banks* and *Clark* were decided, many defendants convicted of murder with a felony-murder special circumstance whose convictions predate *Banks* and *Clark* have filed habeas corpus petitions challenging the sufficiency of the evidence of the special circumstance in light of *Banks* and *Clark*; some defendants have succeeded in having the felony-murder special circumstance finding set aside. (See *In re Moore*, *supra*, 68 Cal.App.5th at pp. 450–451 [listing cases in which "Courts of Appeal have recently vacated felony-murder special-circumstance findings"].)

In 2018, Senate Bill No. 1437 (2017-2018 Reg. Sess.) (S.B. 1437) amended the definition of murder. (*Price*, *supra*, 71 Cal.App.5th at p. 1134.) As relevant to this appeal, S.B. 1437 (1) amended section 189 so that felony

---

[5] In *Banks*, our high court explained that "[r]eckless indifference to human life 'requires the defendant be "*subjectively* aware that his or her participation in the felony involved a grave risk of death." ' " (*Banks*, *supra*, 61 Cal.4th at p. 807.) "Awareness of no more than the foreseeable risk of death inherent in any armed crime is insufficient; only knowingly creating a 'grave risk of death' " suffices. (*Id.* at p. 808.)

In *Clark*, our high court observed, "The mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life." (*Clark*, *supra*, 63 Cal.4th at p. 618.) The *Clark* court analyzed whether the defendant exhibited "reckless indifference to human life" using "case-specific factors . . . courts have considered in upholding a determination of reckless indifference to human life in cases involving nonshooter aiders and abettors to commercial armed robbery felony murders." (*Ibid.*) These were: (1) the defendant's knowledge of weapons, and use and number of weapons, (2) the defendant's presence at the crime and opportunities to restrain the crime or aid the victim, (3) the duration of the felony, (4) the defendant's knowledge of his confederate's likelihood of killing, and (5) the defendant's efforts to minimize the risks of violence. (*Id.* at pp. 618–621.) The court noted that no one factor is necessary, nor is any one of them necessarily sufficient. (*Id.* at p. 618.)

murder liability is now generally limited "to cases in which the felony-murder special circumstance [of section 190.2] was proven" and (2) "provided a retroactive resentencing remedy under section 1170.95 for individuals who were convicted of murder prior to the amendment [who] could not [now] be convicted under the [current definition of murder]." (*Ibid.*)

Under the remedy provided, when a defendant files a petition in compliance with section 1170.95, subdivision (b), the trial court assesses "whether the petitioner has made 'a prima facie showing' for relief. (§ 1170.95, subd. (c).)" (*People v. Lewis* (2021) 11 Cal.5th 952, 960.) "If the trial court determines that a prima facie showing for relief has been made, the trial court issues an order to show cause, and then must hold a[n evidentiary] hearing 'to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts . . . .' " (*Ibid.*)

## C. *Current Proceedings*

### 1. Wilson's Petition Under Section 1170.95

In March 2019, Wilson filed a petition for resentencing under section 1170.95.

The district attorney filed an opposition to the petition, asserting the jury's felony-murder special circumstance findings precluded relief under section 1170.95. Citing facts from the trial transcript, the district attorney further argued the evidence showed Wilson "was a major participant because he planned the robbery, and he acted with reckless disregard . . . because he was willing to have the victims killed in order to accomplish the robbery."

The superior court appointed counsel for Wilson and assigned the matter to Judge William Pendergast, III, as the judge who presided over Wilson's double murder trial had retired and was unavailable.

With assistance of counsel, Wilson filed a response to the district attorney's opposition. His counsel acknowledged Wilson was a "major participant" in the robbery but argued, "under today's more exacting, less inclusive, less broad" standards for "reckless indifference to human life," there was a prima facie showing that Wilson did *not* act with reckless indifference. Wilson intended to testify at the evidentiary hearing.

On October 30, 2020, the trial court heard argument on Wilson's section 1170.95 petition. Wilson's counsel explained there was a split of authority on whether a defendant with a felony-murder special circumstance finding predating *Banks* and *Clark* is permitted to challenge the special circumstance finding in a petition under section 1170.95. He urged the trial court to follow the "cases that say that this issue can be decided on 1170.95 petitions."

As to the merits of the petition, counsel argued Wilson made a prima facie showing entitling him to an evidentiary hearing at which Wilson would testify. Counsel stated: "I think the Court could reasonably decide that [Wilson] was really quite honest at the end, that this was a robbery, that he knew there was a risk, that he didn't want that risk to be fulfilled, that he— his companion had talked about killing, talked about guns. He thought [Camper] was joking. He'd never actually seen that from this co-defendant, and he didn't want these people killed.

"In terms of the [*Clark*] factors, of what is to be considered on reckless indifference . . . . The ones to really stress here are this: The killing was done by the co-defendant almost before Mr. Wilson even arrived at the scene.

"He said, I was walking down the hall. He was going to grab the money, and as he's walking he hears the gun go off.[6] So in terms of the duration of this felony, it happened almost before he even arrived. There wasn't anything that he could do at that point.

"So I think that the Court should find . . . that he has presented a prima facie case for relief, set this matter for a show cause hearing and listen to the evidence that is presented at that time. We can present new, additional evidence. Mr. Wilson did not testify in the original trial. . . . The Court should find that he is permitted to raise the issue of reckless indifference and major participant at that hearing . . . ."

### 2. The Trial Court's Ruling

The trial court denied Wilson's petition on two grounds. First, it agreed with the district attorney that Wilson was ineligible for resentencing as a matter of law based on the jury's felony-murder special circumstances findings. Second, the court found in the alternative that Wilson failed to establish a prima facie case on the merits.

The court explained its second reason: "I believe the five [*Clark*] factors show the defendant was a major participant acting with reckless indifference, even under the most stringent defense of these terms as now established. The Court acknowledges when this defendant was convicted, not all this case law had been developed, so there's an argument that under this new case law perhaps he wouldn't be, but I disagree with that proposition as well.

---

[6] We note that Wilson told the police he saw Camper "shoot him in the neck" and "I see a little hole in his neck," apparently referring to Werder who was shot through the head and neck. Wilson also said he saw Caldera, who "ran up out of his chair and fell and said, 'I'm dead.'" Thus, according to Wilson, he saw both victims when they were killed.

"When I look at the [*Clark*] factors, one, knowledge of weapons and use of a number of weapons, Defendant knew there was weapons. There's evidence there was at least two weapons, and the weapons were used.[7]

"Number two, the physical presence of the crime, opportunity to restrain a crime and/or aid the victim. The defendant . . . was present in the house. He was present after the murders were accomplished. There's no evidence he took efforts to restrain or aid the victims.

"Number three, the duration of the felony. This is perhaps the weakest of the [*Clark*] factors. This appears to have been a relatively quick [crime], but it was no faster than what had to have been done to accomplish the means; but this wasn't a prolonged incident such that they held somebody hostage or . . . stalked people for hours.

"Number four, Defendant's []knowledge of the cohort's likelihood of killing. I think that's perhaps the strongest factor that makes him ineligible, because there was evidence from both the defendant's own statements and the trial transcripts that the co-defendant told him that he might have to kill the victims to pull off the robbery, that he was eager to participate and that he told him about his desire to kill anyone, and those factors I believe were perhaps the most telling here.

"And then number five, Defendant's efforts to minimize the risk of violence during the felony. There's no evidence that he said, don't take the guns, let's unload the guns, you know, let me hold the gun since you're the one with the trigger happy disposition. And if you look at the factor here, the

---

[7] In the current proceedings, Wilson acknowledged the evidence at trial suggested the victims were killed by different weapons. The bullet recovered from Werder was consistent with a caliber generally fired from a revolver, while the bullet from Caldera's body was consistent with ammunition fired from a semiautomatic firearm.

13

petitioner was aware that the co-defendant wanted to shoot and planned to shoot the victims, and he did nothing to prevent that."

Concluding the hearing, the court repeated its belief that Wilson was ineligible for resentencing under section 1170.95 as a matter of law and then stated, "And if I'm wrong about that . . ., I find that on the merits, he's ineligible for resentencing."

## DISCUSSION

Wilson contends, first, the trial court erred in ruling that the jury's pre-*Banks* and *Clark* felony-murder special circumstance findings disqualified Wilson from seeking relief under section 1170.95 as a matter of law and, second, the trial court engaged in improper factfinding in connection with determining whether he made a prima facie showing for relief. We agree with Wilson's first contention and reject the second contention.

A.   *The Effect of Felony-Murder Special Circumstance Findings Made Before the* Banks *and* Clark *Decisions*

The question whether a felony-murder special circumstance finding made before *Banks* and *Clark* precludes a petitioner from making a prima facie showing of eligibility for relief under Penal Code section 1170.95 is pending before the California Supreme Court. (*People v. Strong* (rev. granted Mar. 10, 2021, S266606.)

Some cases "have held that a special circumstance finding, including one made prior to *Banks* and *Clark*, categorically bars relief under section 1170.95 unless and until the petitioner first obtains a ruling, on direct appeal or habeas corpus review, that the special circumstance finding is not supported by substantial evidence under the *Banks/Clark* standard." (*Price*, *supra*, 71 Cal.App.5th at pp. 1147–1148 [citing cases].)

However, we disagree with these cases and instead follow the approach our division took in *Price*, *supra*, 71 Cal.App.5th at pages 1149–1161. Under

14

this approach, " 'where a petitioner facing a felony-murder special-circumstance finding has never been afforded a *Banks*/*Clark* sufficiency-of-the-evidence review by any court, [either] at the trial or appellate level,' he or she may seek resentencing under section 1170.95, but the resentencing court should undertake a sufficiency-of-the-evidence analysis 'at the prima facie entitlement-to-relief stage of a resentencing proceeding under subdivision (c) of [section 1170.95].' " (*Price, supra*, 71 Cal.App.5th at p. 1149, quoting *People v. Secrease* (2021) 63 Cal.App.5th 231, 255, (*Secrease*), rev. granted June 30, 2021, S268862.) "Only if the resentencing court first determines the record of conviction does not contain substantial evidence to support the finding under *Banks* and *Clark* is the petitioner entitled to an order to show cause and an evidentiary hearing. [Citations.] If the resentencing court concludes sufficient evidence in the trial record 'meets the minimum threshold of personal culpability set by *Banks* and *Clark*,' the felony-murder special circumstance finding will 'foreclose resentencing as a matter of law.' " (*Ibid.*)

Thus, we disagree with the trial court's first reason for denying Wilson's petition. Where a petitioner has a felony-murder special circumstance finding that was made pre-*Banks* and *Clark* and that has never been reviewed under *Banks* and *Clark*, the special circumstance finding, by itself, does not necessarily preclude the petitioner from seeking relief under section 1170.95.

B.  *Sufficiency-of-the-Evidence Review*

1.  <u>Sufficiency-of-the-Evidence Review is Not Factfinding</u>

The trial court's alternative ground for denying Wilson's petition was that the record of conviction showed Wilson "was a major participant acting with reckless indifference, even under the most stringent defense of these

15

terms as now established." Wilson argues that the trial court here erred by engaging in improper factfinding at the prima facie stage. As we have explained, however, it is appropriate for the trial court at the prima facie stage to "undertake a sufficiency-of-the-evidence analysis" regarding the petitioner's pre-*Banks* and *Clark* felony-murder special circumstance findings. (*Price, supra*, 71 Cal.App.5th at p. 1149.) Therefore, we reject Wilson's claim that the trial court improperly engaged in factfinding at the prima facie stage. It appears instead that the trial court properly considered whether the evidence at Wilson's criminal trial was sufficient to support the jury's felony-murder special circumstance findings under the "most stringent" standards of *Banks* and *Clark*.

     2.     <u>Substantial Evidence Supports the Jury's Felony-Murder Special Circumstance Findings in This Case</u>

Wilson also challenges the adequacy of the trial court's sufficiency-of-the-evidence review, claiming the court did not review the videorecording of his police interview because, if it had, "it would almost certainly have acknowledged that—contrary to what the written transcript says—Wilson told the officers he '*didn't*' think Camper was going to shoot the victims." But we will not assume the trial court's review of the evidence was inadequate.

In any event, whether Wilson made a prima facie showing entitling him to an evidentiary hearing is an issue of law we review de novo. (*Secrease, supra*, 63 Cal.App.5th at p. 255 ["As is always the case with sufficiency-of-the-evidence review, the application of *Banks* and *Clark* to a given set of facts ultimately presents an issue of law"].)

"The standard of review for a sufficiency of the evidence claim as to a special circumstance is whether, when evidence that is reasonable, credible, and of solid value is viewed 'in the light most favorable to the prosecution,

16

any rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt.' " (*Clark*, *supra*, 63 Cal.4th at p. 610.)

"The ultimate question pertaining to being a major participant is 'whether the defendant's participation "in criminal activities known to carry a grave risk of death" [citation] was sufficiently significant to be considered "major[.]" [Citation.]' [Citation.] Among the relevant factors in determining this question . . . [are] the following: 'What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inactions play a particular role in the death? What did the defendant do after lethal force was used?' " (*Clark*, *supra*, 63 Cal.4th at p. 611.)

Reckless indifference to human life "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark*, *supra*, 63 Cal.4th at p. 617.) Recklessness "encompasses both subjective and objective elements. The subjective element is the defendant's conscious disregard of risks known to him or her. But recklessness is not determined merely by reference to a defendant's subjective feeling that he or she is engaging in risky activities. Rather, recklessness is also determined by an objective standard, namely what 'a law-abiding person would observe in the actor's situation.' " (*Ibid.*)

17

Wilson's police interview was about five and a half hours long, and the entire interview was played for the jury. Wilson told the police in the interview that he said to Camper, "we might have to take 'em out" and Camper responded, "All right." Wilson said that he had seen Caldera shoot people on two occasions and that he was afraid of both Caldera and Werder. Wilson wanted to leave "this gang" and suggested if he took the victims' money and remained in Vallejo, "the older guy" won't "kill me." According to Wilson, Camper asked him, "Are you sure you want to take the money?" and after Wilson responded, "Yeah, I'm sure," Camper "was like, 'I'm gonna have to kill 'em.'" Wilson told the police he was thinking "like no let's just take the money," but Camper "hit me with my finger trigger is itchy." Camper told Wilson his finger was "trigger happy" and "I'm ready to kill anybody." Wilson also said he "told [his girlfriend] everything" and later said that he told her he was "a killer."

By Wilson's own admissions, he was afraid of the victims and believed they might kill him if he stole from them, he and Camper planned to rob the victims, he told Camper, "we might have to take 'em out" and Camper agreed, he knew Camper believed himself "ready to kill anybody," he knew Camper was armed with Caldera's gun, and he was present when both victims were killed. This was sufficient evidence for a reasonable factfinder to determine Wilson acted with reckless indifference to human life as a major participant in the robbery of Werder and Caldera.

Wilson emphasizes his statements to the police that he didn't "think [Camper] was gonna do it. I thought he was just bullshitting me," and that the plan was just to take the money and leave. During the interview, he said, "I didn't think he was gonna shoot 'em," "I didn't think he was gonna do it," and "I never even thought Charles would do something like that." But "[a]

18

rational trier of fact could disbelieve those portions of [a] defendant's statements that [a]re obviously self-serving." (*People v. Silva* (2001) 25 Cal.4th 345, 369.)  Thus, a reasonable factfinder could disbelieve Wilson's self-serving claims that he did not think Camper would kill the victims.  And, under an objective standard, a law-abiding person in Wilson's situation would understand that a plan to rob two drug dealers (one of whom was known to have shot at least two people) with an armed confederate who has said he was "gonna have to kill 'em" would involve a grave risk of death.

In short, we find sufficient evidence supports the jury's felony-murder special circumstance findings under the standard of *Banks* and *Clark*. Consequently, Wilson is not eligible for resentencing under section 1170.95. (*Price*, *supra*, 71 Cal.App.5th at p. 1149 ["If the resentencing court concludes sufficient evidence in the trial record 'meets the minimum threshold of personal culpability set by *Banks* and *Clark*,' the felony-murder special circumstance finding will 'foreclose resentencing as a matter of law' "].)

## DISPOSITION

The judgment is affirmed.

_____
Miller, J.

WE CONCUR:


_____
Richman, Acting P.J.


_____
Mayfield, J.*


A161420, *People v. Wilson*

_____

    * Judge of the Mendocino County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.